**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| COASTAL CHARTER SERVICES, LLC, RODRIGUE BUSINESS ASSOCIATES, LLC, and OLDEN RODRIGUE, JR., | * | CIVIL ACTION NO. |
| *Plaintiffs* | * | |
| v. | * | |
| LOOP, LLC, | * | |
| *Defendant* | * | |

## CLASS ACTION COMPLAINT FOR DAMAGES

Plaintiffs Coastal Charter Services, LLC, Rodrigue Business Associates, LLC, and Olden Rodrigue, Jr., individually and on behalf of a putative class of similarly situated individuals and entities, hereby file this Class Action Complaint for Damages against Defendant LOOP, LLC ("LOOP"), and allege as follows:

## INTRODUCTION

This lawsuit arises from a significant oil spill that has caused substantial harm to Louisiana's coastal fishing communities. In the early morning hours of February 26, 2026, a cargo hose under the custody and control of Defendant LOOP, LLC ("LOOP") failed during a crude oil transfer operation at its offshore deepwater port located approximately 18 miles off the Louisiana coast in the Gulf of America, in Terrebonne and Lafourche Parish waters. The failure released more than 31,500 gallons of Venezuelan sour crude oil, one of the densest and most environmentally persistent grades of crude oil in the world, directly into federal and Louisiana waters.

Rather than responding swiftly and transparently, LOOP initially minimized and misrepresented the scope of the disaster. Days passed before the public learned the truth. By then, the heavy Venezuelan crude had migrated more than 18 miles into Louisiana's territorial waters, coating marshlands, contaminating oyster beds, fouling shrimping and fishing grounds, and covering boats, traps, nets, and live seafood with a viscous black sludge. On March 14, 2026, state health authorities ordered the closure of six Molluscan Shellfish Areas in Terrebonne Parish. Even after those areas were reopened on April 3, 2026, fishermen and charter operators continued to find oil on their equipment and in their catches.

The timing of the spill was particularly harmful to those who earn their living on Louisiana's coastal waters. The spill struck immediately before the opening of the state's inland shrimping season, the peak of the crabbing season, and the oyster spawning season. For Mr. Rodrigue, his charter services company, and his associated marine business, the contamination of the very barrier islands and coastal marshes on which their livelihoods depend has caused, and continues to cause, devastating economic and reputational harm.

To make matters worse, LOOP has operated a "Claims Center" that Plaintiffs allege does not comply with the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 et seq. LOOP's representatives have pressured claimants into signing sweeping releases of all present and future claims, without counsel, under threat of losing any recovery, while withholding the disclosures OPA mandates. Plaintiffs now bring this action individually and on behalf of all similarly situated persons and entities to hold LOOP accountable for the full measure of its misconduct. OPA's mandatory advertising provisions require a Responsible Party to publicly advertise, for a minimum of 30 days, that it has been designated as the Responsible Party and to describe the procedures by which claims may be presented. 33 U.S.C. § 2714(b)(1). OPA further requires that this advertising specifically

inform potential claimants of their right to seek interim, short-term partial settlements without foreclosing the right to pursue additional damages in the future. 33 U.S.C. § 2714(b)(2).

## PARTIES

1. Plaintiff Coastal Charter Services, LLC ("Coastal Charter") is a Louisiana limited liability company domiciled and maintaining its principal place of business in the Parish of Terrebonne, State of Louisiana. Coastal Charter provides year-round guided fishing trips targeting speckled trout and redfish, seasonal waterfowl hunting, and nightly bowfishing excursions. Operating primarily out of Cocodrie, Louisiana, Coastal Charter runs guided trips along Louisiana's barrier islands, waters recognized as among the most productive speckled trout and redfish habitat in the world. These trips are led by Captain Olden Rodrigue, Jr., a licensed and insured charter captain with over 18 years of experience. During the 60-day waterfowl season, Coastal Charter offers blast-and-cast trips combining duck hunting with inshore fishing. Bowfishing trips are conducted nightly in the shallow coastal marshes. Coastal Charter's business is entirely dependent on clean, accessible coastal waters.

2. Plaintiff Rodrigue Business Associates, LLC ("Rodrigue Business") is a Louisiana limited liability company domiciled and maintaining its principal place of business in the Parish of Terrebonne, State of Louisiana. Rodrigue Business owns and operates The Redfish Camp, a commercial fishing and charter boat enterprise whose operations depend entirely on the health and accessibility of Louisiana's coastal and inshore waters.

3. Plaintiff Olden Rodrigue, Jr. ("Mr. Rodrigue") is an individual of full age and legal capacity who is domiciled in the Parish of Terrebonne, Louisiana. Mr. Rodrigue is a licensed charter

boat captain and commercial fisherman with more than 18 years of professional experience operating in Louisiana's coastal waters out of Cocodrie, Louisiana. He has been recognized for his expertise on multiple television fishing programs, including Castin' Cajun, Scales & Tails, and Louisiana Outdoor Adventures. His livelihood, reputation, and professional identity are inseparable from the health of the coastal waters and barrier islands that LOOP's spill has now contaminated.

4. Defendant LOOP, LLC ("LOOP") is a Delaware limited liability company authorized to do and doing business in the State of Louisiana, with its registered agent and principal Louisiana business establishment located in Covington, Louisiana. LOOP is a joint venture of Marathon Pipe Line LLC, Shell Oil Company, and Valero Terminaling and Distribution Company. LOOP owns and operates the Louisiana Offshore Oil Port, the only deepwater offshore port in the United States capable of receiving, storing, and distributing crude oil from ultra-large and very-large crude carriers.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 33 U.S.C. § 2717(b), as Plaintiffs assert claims arising under the Oil Pollution Act, 33 U.S.C. § 2701 et seq. This Court also has admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, as Plaintiffs assert claims arising under general maritime law. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 33 U.S.C. § 2717(b). The oil discharged from LOOP's offshore facility migrated into the territorial waters of Terrebonne Parish and Lafourche Parish, both of which are located within the Eastern

District of Louisiana. LOOP's onshore pipeline infrastructure terminates at Port Fourchon in Lafourche Parish and continues inland to Clovelly, Louisiana, both within this district. Plaintiffs are domiciled and operate their businesses in Terrebonne Parish, within this district. LOOP's registered agent for service of process in Louisiana is located in Covington, St. Tammany Parish, within this district. The injuries and damages at issue were sustained within this district.

## FACTUAL BACKGROUND

### A. LOOP's Offshore Oil Port Operations

7. LOOP operates what it describes as the largest facility of its kind in the United States, a deepwater offshore oil port located in the Gulf of America approximately 18 miles off the Louisiana coast, in roughly 110 feet of water. The LOOP Port is the only facility in the country capable of offloading vessels ranging from Medium Range tankers to Ultra Large Crude Carriers (ULCCs) and Very Large Crude Carriers (VLCCs).

8. Incoming vessels anchor at one of LOOP's three single-point moorings, where sophisticated hoses connect to the ship's manifold and crude oil is pumped through a 56-inch subsea pipeline to LOOP's marine terminal pumping platform. From there, four to seven thousand-horsepower pumps push the oil through a 48-inch pipeline that carries crude to Fourchon, Louisiana at rates up to 100,000 barrels per hour. A second pump system then moves the oil an additional 23 miles inland to LOOP's Clovelly Hub in Clovelly, Louisiana, where it is measured, segregated, and stored in a network of underground and aboveground caverns and tanks. When loading crude back onto outbound vessels, the entire system operates in reverse.

9. LOOP has publicly and repeatedly advertised its commitment to protecting personnel, the public, and the sensitive marine environment surrounding its facilities. Its promotional materials specifically tout the sophistication of its spill prevention, containment, and remediation capabilities, and declare that its employees and contractors are dedicated to preserving the rich animal and plant life of the Mississippi Delta and South Louisiana. The February 26, 2026 spill and LOOP's response thereto call those representations into serious question.

**B. The February 26, 2026 Oil Spill**

10. At approximately 4:00 a.m. on February 26, 2026, a cargo hose owned, operated, and/or controlled by LOOP failed during the transfer of crude oil from a tanker vessel to the LOOP Port. The failure caused the release of more than 31,500 gallons, approximately 750 barrels, of Venezuelan sour crude oil directly into the Gulf of America.

11. The crude oil involved in this spill is Venezuelan sour crude, a high-sulfur, low-hydrogen, exceptionally dense and viscous grade of oil sometimes described as a semi-solid tar and widely regarded as among the most environmentally damaging crude varieties in the world. Because of its density and chemical composition, this oil resists degradation, adheres tenaciously to shorelines, marshland vegetation, and marine life, is difficult to remediate once it reaches sensitive environments, and poses heightened ingestion risks to birds and marine mammals.

12. Venezuelan crude also has a pronounced tendency to form tar balls and other semi-solid masses that sink over time, making recovery extremely difficult. Upon information and

belief, LOOP had reason to know before accepting this shipment that its equipment and procedures may not have been adequate to handle crude of this density and corrosivity.

13. Despite the scale of the release, over 31,500 gallons of one of the world's most environmentally hazardous crude varieties, LOOP's initial public communications grossly understated the incident. On February 27, 2026, LOOP issued a statement acknowledging only that crude oil had been "discovered" near its offshore facility, claimed the source had been secured and recovery crews deployed, and affirmatively stated that no shoreline impact had been observed or was anticipated.

14. Five days elapsed before LOOP publicly acknowledged that oil had in fact reached Louisiana's barrier islands. Even then, in a March 3, 2026 press release, LOOP represented the spill as involving only "approximately 12,600 gallons" with a "substantial portion" already recovered, a characterization that proved to be a significant understatement.

15. By March 5, 2026, LOOP revised its estimate upward to 750 barrels (31,500 gallons), acknowledging that only 616 barrels had been recovered, predominantly from offshore waters. The response effort at that point involved 330 responders, 40 vessels, multiple aircraft and drones, and more than 5,000 feet of containment boom. By March 26, 2026, the scale of the response had grown to 677 responders, 107 vessels, multiple aircraft, and 158,400 feet (approximately 30 miles) of protective and collection boom. The scale of the response increased substantially over time as the extent of the contamination became apparent.

16. Because of LOOP's inadequate initial response and its failure to accurately characterize the scope of the spill in its early communications, substantial volumes of Venezuelan crude

oil migrated more than 18 miles into Louisiana's territorial waters. By March 9, 2026, residents and working fishermen throughout Terrebonne Parish were reporting oily sheen in waters adjacent to their docks, oil coating their vessels and equipment, and oil contaminating their live seafood hauls.

17. On March 14, 2026, the Louisiana Department of Health responded to the documented oil contamination by ordering the closure of Basin 12, encompassing Molluscan Shellfish Areas 15, 16, 17, 18, 19, and 21, in Terrebonne Parish. These areas remained closed until April 3, 2026. The closures directly impacted the oyster, shrimp, crab, and finfish industries throughout the region.

18. Despite the reopening of Basin 12, shrimpers, crabbers, and charter operators in Terrebonne Parish and throughout Louisiana's coastal parishes continued to report oil sludge on their catch, equipment, and vessels well into April 2026. As recently as April 1, 2026, commercial fishermen were pulling shrimp and crabs from Louisiana territorial waters visibly covered in oily residue.

19. On March 30, 2026, the Unified Command, comprised of the U.S. Coast Guard, the Louisiana Oil Spill Coordinator's Office (LOSCO), and LOOP, issued a press release acknowledging that the Venezuelan crude oil contaminating Louisiana's marshlands would not be fully remediated. The oil will instead remain in place, degrading slowly over time, continuing to pose a threat to wildlife, marine life, and the environment for the foreseeable future. The press release further acknowledged that the crude's tendency to break into tar balls means it will persist and travel with currents, extending the geographic reach of contamination.

**C. Damages Sustained by Plaintiffs**

20. Plaintiff Coastal Charter Services, LLC built its business around the barrier islands and coastal marshes of Terrebonne Parish, the same waters now fouled by LOOP's spill. Coastal Charter's guided fishing trips for speckled trout and redfish, its blast-and-cast waterfowl and fishing combination packages, and its nightly bowfishing excursions are all conducted in shallow coastal waters along Louisiana's barrier island chain. Oil contamination in and around these areas has rendered Coastal Charter unable to operate its customary trips, has caused client cancellations, has resulted in lost bookings and lost revenue, and has damaged the reputation of the business and the waters it depends upon. The spill arrived at the worst possible time, on the eve of peak season, threatening to wipe out the most commercially significant months of the year.Specifically, Coastal Charter sustained documented client cancellations for trips scheduled during the period of March 16 through March 19, 2026, directly attributable to the oil contamination in its operating waters. In addition, one or more of Coastal Charter's vessels sustained oil and sludge contamination requiring cleaning and remediation as a direct result of the spill. Coastal Charter's losses, including lost charter revenue, vessel cleaning and remediation costs, and other consequential damages, are ongoing and are in an amount to be proven at trial.

21. Plaintiff Rodrigue Business Associates, LLC, through its operation of The Redfish Camp, likewise depends entirely on the health and accessibility of Louisiana's inshore and coastal waters. As a commercial fishing and charter boat enterprise, Rodrigue Business has been unable to conduct normal operations in its traditional fishing grounds as a result of the contamination caused by LOOP's spill. The business has sustained lost revenue from

commercial fishing operations, lost charter income, and other consequential economic losses that continue to accumulate, all in an amount to be proven at trial.

22. Plaintiff Olden Rodrigue, Jr. has spent more than 18 years building a professional reputation as one of Louisiana's premier charter boat captains and commercial fishermen, a reputation recognized on national television through appearances on Castin' Cajun, Scales & Tails, and Louisiana Outdoor Adventures. The contamination of the Cocodrie-area barrier islands and coastal marshes where he has built his livelihood threatens not only his immediate income but the professional identity and reputation he has cultivated over nearly two decades. Mr. Rodrigue has suffered and continues to suffer lost income, lost bookings including documented cancellations for the period of March 16 through March 19, 2026, oil and sludge contamination to his vessels requiring cleaning and remediation, damage to his professional reputation, and other economic and consequential losses, all in an amount to be proven at trial.

23. The harm suffered by Plaintiffs is shared by a broad class of similarly situated individuals and businesses, commercial fishermen, shrimpers, crabbers, charter operators, dock owners, processors, seafood distributors, oyster leaseholders, and all others whose economic livelihood depends on the quality and reputation of Louisiana's coastal waters and seafood. These individuals and businesses have been forced to discard contaminated seafood, clean oil-fouled vessels and equipment, travel greater distances at prohibitive fuel cost to reach unaffected waters, and absorb lost income during the most economically critical period of the year. The full extent of their losses has yet to be determined.

**D. LOOP's Unlawful Claims Center Operations**

24. LOSCO, Louisiana's lead state agency for oil spill response, has publicly identified LOOP as the Responsible Party for the February 26, 2026 spill. LOOP itself has never disputed its responsibility. At all relevant times, LOOP has acknowledged that the spill originated from its offshore facility.

25. In its March 17, 2026 press release, LOOP directed claimants to file with Global Risk Solutions, a private claims-handling company retained and directed by LOOP, as well as with the National Pollution Funds Center, a division of the U.S. Coast Guard.

26. On or about March 25, 2026, LOOP shifted its approach and began directing affected individuals and businesses to a "Claims Center" physically located at the Courtyard by Marriott Houma, 142 Library Dr., Houma, Louisiana 70360, open Monday through Saturday, 8:00 a.m. to 6:00 p.m. A telephone hotline was also made available between 8:00 a.m. and 7:00 p.m.

27. Although LOOP's advertising for its Claims Center gave the appearance of a lawful OPA presentment process, LOOP's actual operations at the Claims Center were deeply contrary to the requirements and spirit of OPA. Rather than informing claimants of their statutory rights, LOOP's representatives presented claimants with broad, comprehensive releases purporting to discharge all past and future claims against LOOP arising from the spill. Claimants were told that if they wished to confer with an attorney, leave to consult a family member, or simply think before signing, the settlement offer would be immediately withdrawn. Some claimants were not even permitted to walk to their vehicles to speak with a waiting spouse or relative.

28. Under these coercive conditions, at least one plaintiff and numerous putative class members executed releases without legal counsel, without meaningful opportunity for deliberation, and without the disclosures OPA requires. These releases purport to extinguish not only present claims but also future claims the claimants may not yet know they have.

29. OPA imposes specific, non-waivable obligations on a Responsible Party. Among them: the Responsible Party must advertise, for no fewer than 30 days, that it is the Responsible Party and must describe the claims procedures and claimants' statutory rights. See 33 U.S.C. § 2714(b). Critically, the Responsible Party must inform claimants that they may seek interim or short-term partial settlements without waiving their right to pursue additional damages in the future. LOOP's advertising and claims process included none of these required disclosures.

30. LOOP's failure to comply with OPA's advertising and claims requirements constitutes a waiver of any presentment requirement otherwise applicable under 33 U.S.C. § 2713. Alternatively, Plaintiffs have satisfied or will satisfy all applicable presentment requirements prior to trial.

## **CLASS ACTION ALLEGATIONS**

31. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of themselves and the following proposed class:

> All individuals and entities in the United States who sustained economic losses, property damage, or other harm to their occupations, businesses, or

real or personal property as a result of the oil spill that originated from LOOP, LLC's offshore facility on or about February 26, 2026.

32. Numerosity: The proposed class is so large as to make individual joinder impracticable. Given the geographic scope of the spill and the density of commercial fishing, charter, and seafood-related activity along Louisiana's coast, Plaintiffs reasonably believe the class includes hundreds of members.

33. Commonality and Predominance: Common questions of law and fact predominate over any individualized issues, including without limitation: (a) whether LOOP is the Responsible Party under OPA; (b) whether LOOP was negligent and/or grossly negligent in operating its offshore port, maintaining its equipment, and accepting Venezuelan heavy crude; (c) whether LOOP was negligent and/or grossly negligent in its spill containment and remediation efforts; (d) whether LOOP intentionally misrepresented the scope and severity of the spill to regulators and the public; (e) whether LOOP's claims process violates OPA's mandatory advertising and disclosure requirements; (f) whether releases obtained at LOOP's Claims Center were procured through fraud and duress and are therefore void; (g) whether LOOP has waived OPA's presentment requirement; (h) whether LOOP is liable for punitive or extraordinary damages; and (i) the proper measure of class-wide relief.

34. Typicality: Plaintiffs' claims are typical of those of the class. All Plaintiffs and class members were harmed by the same conduct: LOOP's negligent operation of its offshore facility, its deficient spill response, and its unlawful claims process.

35. Adequacy: Plaintiffs will fairly and adequately represent the interests of the class. Plaintiffs' interests are aligned with, and not adverse to, those of other class members. Plaintiffs are represented by counsel experienced in complex litigation and oil spill class actions, with the resources to prosecute this matter vigorously on behalf of the class.

36. Superiority: Class adjudication is superior to individual litigation. The class mechanism allows numerous similarly situated parties to advance their common claims efficiently, eliminates duplicative proceedings, and ensures that claimants with modest individual damages have a meaningful avenue for redress. The alternatives, hundreds or thousands of individual suits, would squander judicial resources and risk inconsistent results.

## CAUSES OF ACTION

**COUNT ONE: Liability Under the Oil Pollution Act, 33 U.S.C. § 2701 et seq.**

37. Plaintiffs re-allege and incorporate all preceding paragraphs as though fully set forth herein.

38. OPA imposes strict liability on any "responsible party" for a vessel or facility from which oil is discharged into or upon navigable waters or adjoining shorelines. 33 U.S.C. § 2702. At all times relevant hereto, LOOP owned and operated the offshore facility from which the February 26, 2026 discharge originated. LOOP is accordingly the Responsible Party within the meaning of OPA.

39. LOOP is not entitled to any statutory limitation of liability because the spill resulted from LOOP's gross negligence, willful misconduct, and/or violations of applicable federal safety, construction, and operating regulations, and because LOOP failed to report the incident as required by law and failed to provide all reasonable cooperation and assistance

requested by responsible officials in connection with removal activities. See 33 U.S.C. § 2704(c).

40. Plaintiffs and members of the proposed class have suffered economic losses, including lost profits and impairment of earning capacity, and damage to real and personal property as a direct result of the spill, all of which are recoverable under 33 U.S.C. § 2702(b)(2)(B), (C), and (E).

41. Plaintiffs and class members have further suffered a loss of use of natural resources, recoverable under 33 U.S.C. § 2707(2)(C).

42. By operating a claims process that fails to comply with OPA's mandatory advertising and disclosure requirements, LOOP has waived any presentment requirement that might otherwise apply under 33 U.S.C. § 2713. In addition or in the alternative, Plaintiffs have satisfied or will timely satisfy all applicable presentment requirements.

**COUNT TWO: Negligence and Gross Negligence**

43. Plaintiffs re-allege and incorporate all preceding paragraphs as though fully set forth herein.

44. At all relevant times, LOOP owed duties of reasonable care to Plaintiffs and the class in connection with the operation, maintenance, and oversight of the LOOP Port and its associated equipment, including the cargo hose that failed on February 26, 2026. LOOP further owed duties of care with respect to its response to the spill and its communications with the public and regulatory authorities.

45. LOOP breached those duties in the following respects, among others:

a. Failing to properly inspect, maintain, and operate the cargo hose and other equipment used to transfer Venezuelan heavy crude at the LOOP Port;

b. Failing to adequately train and supervise personnel responsible for crude oil transfer operations;

c. Deciding to accept Venezuelan heavy crude oil despite knowing, or having reason to know, that LOOP's equipment and procedures were not designed or adequate to handle crude of that density and corrosivity;

d. Failing to implement and maintain adequate spill prevention protocols commensurate with the environmental sensitivity of the waters surrounding the LOOP Port;

e. Failing to deploy an effective, timely spill response upon learning of the release;

f. Deliberately misrepresenting the volume and severity of the spill in communications to the public and regulatory authorities, thereby delaying the mobilization of adequate response resources and allowing greater volumes of oil to reach Louisiana's coastline;

g. Advertising the sophistication of its spill containment and remediation capabilities in a manner inconsistent with the actual performance of those capabilities during the February 26, 2026 spill and response; and

h. Such other acts and omissions of negligence as the evidence will establish at trial.

46. LOOP knew or should have known that each of these failures would foreseeably result in the type of harm Plaintiffs and class members have sustained.

47. LOOP's conduct, particularly its acceptance of Venezuelan sour crude in equipment and procedures Plaintiffs allege were not adequate to handle crude of that density and corrosivity, its failure to accurately report the volume and scope of the spill, and its conscious disregard for the coastal communities whose livelihoods depended on the waters it polluted, rises to the level of gross negligence and willful misconduct.

48. As a direct and proximate result of LOOP's negligence and gross negligence, Plaintiffs and class members have sustained economic losses, property damage, reputational harm, and emotional distress. LOOP is liable to Plaintiffs under general maritime law and applicable state law, including Louisiana Civil Code article 2315. Plaintiffs are entitled to recover all compensatory damages, including lost profits, diminution in property value, remediation costs, and other consequential damages, as well as punitive and exemplary damages and attorneys' fees and costs under applicable law.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all claims and issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Coastal Charter Services, LLC, Rodrigue Business Associates, LLC, and Olden Rodrigue, Jr., individually and on behalf of all others similarly situated, respectfully pray for judgment against Defendant LOOP, LLC as follows:

A. Certification of this action as a class action pursuant to Federal Rule of Civil Procedure 23. In the event this matter is consolidated with related actions pursuant to 28 U.S.C. § 1407, Plaintiffs respectfully request that their counsel be considered for appointment

to the Plaintiffs' Steering Committee or other leadership position as the Court may establish.

B. An award of all compensatory, consequential, and statutory damages recoverable under OPA, general maritime law, and applicable state law, including but not limited to lost profits, impairment of earning capacity, property damage, diminution in value, remediation costs, and reputational harm;

C. An award of punitive and exemplary damages for LOOP's gross negligence, willful misconduct, and deliberate concealment of the scope of the spill;

D. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

E. An award of attorneys' fees, litigation costs, and expenses to the extent permitted by law; and

F. Such further relief, legal or equitable, as this Court deems just and proper.

Respectfully submitted by,

**DALY & BLACK**
***Attorneys for Plaintiffs***

/s/ Blake E. Corley
**BLAKE CORLEY SBN: 39848**
**DALY & BLACK, P.C.**
**400 Poydras Street | Suite 1900**
**New Orleans, LA 70130**
**Ph: 713.655.1405**
**Fax: 713.655.1587**
**clathrop@dalyblack.com**
**bcorley@dalyblack.com**
**www.dalyblack.com**